UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| RICHARD SCARANTINO, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GANNETT CO., INC., JOHN JEFFRY LOUIS, PAUL BASCOBERT, JOHN E. CODY, STEPHEN W. COLL, DONALD FELSINGER, LILA IBRAHIM, LAWRENCE S. KRAMER, DEBRA A. SANDLER, CHLOE SLADDEN, NEW MEDIA INVESTMENT GROUP INC., ARCTIC HOLDINGS LLC, and ARCTIC ACQUISITION CORP.,<br><br>Defendants. | Case No. _____<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on August 5, 2019 (the "Proposed Transaction"), pursuant to which Gannett Co., Inc. ("Gannett" or the "Company") will be acquired by New Media Investment Group Inc. ("Parent"), Arctic Holdings LLC ("Intermediate HoldCo"), and Arctic Acquisition Corp. ("Merger Sub," and together with Parent and Intermediate HoldCo, "New Media").

2. On August 5, 2019, Gannett's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger

Agreement") with New Media. Pursuant to the terms of the Merger Agreement, Gannett's stockholders will receive $6.25 in cash and 0.5427 of a share of Parent stock for each share of Gannett common stock they own.

3. On August 29, 2019, defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Gannett common stock.

9. Defendant Gannett is a Delaware corporation and maintains its principal executive offices at 7950 Jones Branch Drive, McLean, Virginia 22107. Gannett's common stock is traded on the New York Stock Exchange under the ticker symbol "GCI."

10. Defendant John Jeffry Louis is Chairman of the Board of the Company.

11. Defendant Paul Bascobert is President and Chief Executive Officer of the Company.

12. Defendant John E. Cody is a director of the Company.

13. Defendant Stephen W. Coll is a director of the Company.

14. Defendant Donald Felsinger is a director of the Company.

15. Defendant Lila Ibrahim is a director of the Company.

16. Defendant Lawrence S. Kramer is a director of the Company.

17. Defendant Debra A. Sandler is a director of the Company.

18. Defendant Chloe Sladden is a director of the Company.

19. The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20. Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

21. Defendant Intermediate Holdco is a Delaware limited liability company, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

22. Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Intermediate Holdco, and a party to the Merger Agreement.

**CLASS ACTION ALLEGATIONS**

23. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Gannett (the "Class"). Excluded from the Class are defendants herein and any

person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

24. This action is properly maintainable as a class action.

25. The Class is so numerous that joinder of all members is impracticable. As of July 31, 2019, there were approximately 114,621,418 shares of Gannett common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

26. Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

27. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

28. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

29. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

30. Gannett is a digitally focused media and marketing solutions company committed to strengthening communities across its network.

31. The Company's brands include USA TODAY NETWORK with USA TODAY and more than 100 local media brands, digital marketing services companies ReachLocal, WordStream and SweetIQ, and U.K. media company Newsquest.

32. On August 5, 2019, Gannett's Board caused the Company to enter into the Merger Agreement with New Media.

33. Pursuant to the terms of the Merger Agreement, Gannett's stockholders will receive $6.25 in cash and 0.5427 of a share of Parent stock for each share of Gannett common stock they own.

34. According to the press release announcing the Proposed Transaction:

New Media Investment Group Inc. ("New Media") (NYSE: NEWM) and Gannett Co., Inc. ("Gannett") (NYSE: GCI) announced today that New Media and Gannett have entered into a definitive agreement (the "Merger Agreement") pursuant to which New Media will acquire Gannett for a combination of cash and stock (the "Merger").

Under the terms of the Merger Agreement, shareholders of Gannett will receive $6.25 in cash and 0.5427 of a New Media share for each Gannett share they hold, representing total consideration of $12.06 per Gannett common share based on New Media's closing stock price as of August 2, 2019, and a premium of approximately 18% to the five-day volume-weighted average price of Gannett shares as of that date. After the close of the transaction, Gannett shareholders will hold approximately 49.5% of the combined company and New Media shareholders will hold approximately 50.5%. . . .

Leadership and Governance

The combined company's management team will be led by New Media's current Chairman and Chief Executive Officer, Michael Reed. Alison Engel, Gannett's current Chief Financial Officer, is expected to serve as the Chief Financial Officer

of the combined organization upon closing. Gannett's newly appointed Chief Executive Officer, Paul Bascobert, will become Chief Executive Officer of the combined company's operating subsidiary. The rest of the combined company's senior executive team, which is expected to be composed of highly experienced leaders from both companies, will be announced at a later date.

Mr. Bascobert was the President of XO Group from 2016 until its sale to Permira Equity in 2019. During his tenure, he helped lead the company's transformation from a media company to a marketplace business. Prior to XO, Mr. Bascobert led sales, service, and marketing for the Local Businesses segment at Yodle from 2014 until 2016. Before that, he spent four years at Bloomberg LP as President of Bloomberg Businessweek from 2010 until 2014, in addition to serving as Chief Operating Officer of the Media Group from 2011 to 2014. Mr. Bascobert joined Bloomberg from Dow Jones & Co. where he was Senior Vice President of Operations from 2006 until 2007 and Chief Marketing Officer from 2007 until 2009.

The combined company's Board of Directors will have nine members, including Mr. Reed as Chairman, five independent directors from New Media, and three independent directors from Gannett. Mr. Kevin Sheehan, who currently serves as New Media's Lead Director, will serve as the combined company's Lead Director. New Media has been actively engaged in a director search and expects to announce two additional independent directors prior to closing. The companies believe that diversity can strengthen board performance and New Media is actively searching for women and other candidates with diverse backgrounds and experiences.

After the closing of the Merger, both New Media and its operating subsidiary GateHouse, will be rebranded and operate under the "Gannett" brand. The combined company will be headquartered in McLean, Va., with a continued corporate presence in existing locations.

Financing

New Media expects to fund the cash portion of the Merger consideration through a combination of cash on the balance sheet and a new term loan facility (the "Term Loan") to be funded at closing pursuant to a binding commitment from funds managed by affiliates of Apollo Global Management, LLC (NYSE:APO), a global alternative investment manager with approximately $312 billion in assets under management, as of June 30, 2019, and deep experience in supporting media companies. The Term Loan, which will be used to retire existing financial debt obligations of both companies and to fund the cash component of merger consideration, will be a five-year senior secured term loan facility in an aggregate principal amount of $1.792 billion. The Term Loan will be freely pre-payable without penalty, and the combined company is expected to have a strong cash-flow profile that will permit aggressive deleveraging. Total pro forma leverage at closing of the Merger is expected to be approximately 3.5x LTM As

>Adjusted EBITDA, before run-rate synergies, and 2.3x including run-rate synergies. Target net leverage within two years of closing is expected to be below 1.75x.
>
>Dividend
>
>Initially, the combined company is expected to have an annual dividend of $0.76 per share. It is expected that the dividend will be increased over time as synergies are realized and leverage is reduced. . . .
>
>Timing and Approvals
>
>New Media formed the Transaction Committee to review, evaluate, and negotiate the Merger and the Internalization (including the terms of the Amended Management Agreement). The Merger has been unanimously approved by the New Media Transaction Committee and by the Boards of both companies. The New Media Transaction Committee separately, and unanimously, approved the Amended Management Agreement.
>
>The Merger is expected to close by the end of 2019, subject to the satisfaction of customary closing conditions, including receipt of regulatory clearances and approval by the shareholders of each company.
>
>Advisors
>
>Credit Suisse is serving as financial advisor to New Media, and Cravath, Swaine & Moore LLP is serving as principal legal counsel. New Media's Transaction Committee retained Jefferies LLC as its independent financial advisor, and Wilson Sonsini Goodrich & Rosati as its legal counsel.
>
>Greenhill & Co., LLC and Goldman Sachs & Co. LLC are serving as financial advisors to Gannett, and Skadden, Arps, Slate, Meagher & Flom LLP and Nixon Peabody LLP are serving as legal counsel.

35. The Merger Agreement contains a "no solicitation" provision that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 7.04(a) of the Merger Agreement provides:

>Except as expressly permitted by this Section 7.04, none of the Company or any of the Company Subsidiaries shall (whether directly or indirectly through its Representatives or other intermediaries), nor shall the Company authorize or permit any of its Representatives to: (i) solicit, initiate or knowingly encourage or

knowingly facilitate any Company Acquisition Proposal or knowingly take any action that would reasonably be expected to lead to any Company Acquisition Proposal, or endorse any Company Acquisition Proposal; (ii) enter into any agreement, including any letter of intent, memorandum of understanding, agreement in principle, acquisition agreement or other agreement (x) to consummate any Company Acquisition Proposal or otherwise relating to any Company Acquisition Proposal (other than a confidentiality agreement entered into in connection with furnishing information in accordance with Section 7.04(b)), (y) to approve or endorse any Company Acquisition Proposal or (z) to require the Company, in connection with any Company Acquisition Proposal, to abandon, terminate or fail to consummate the Merger; (iii) enter into or participate in any discussions or negotiations in connection with any Company Acquisition Proposal or inquiry with respect to any Company Acquisition Proposal, or furnish to any Person any non-public information with respect to its business, properties or assets in connection with any Company Acquisition Proposal; or (iv) agree or publicly propose or resolve to take, or take, any of the actions prohibited by clause (i), (ii) or (iii) of this sentence. The Company shall immediately cease, and cause its Representatives to immediately cease, any and all existing activities, discussions or negotiations with any parties conducted with respect to any of the matters referenced in the preceding sentence. The Company shall, and shall cause its Affiliates to, promptly request any Person that has executed a confidentiality or non-disclosure agreement in connection with any actual or potential Company Acquisition Proposal to return or destroy all confidential information in the possession of such Person or its Representatives. Any violation of this Section 7.04 by any Representative of the Company or the Company Subsidiaries shall be deemed to be a breach of this Section 7.04 by the Company. For purposes of this Section 7.04 (including for purposes of the defined term "Company Acquisition Proposal" below) only, the term "Person" means any person, corporation, entity or "group", as defined in Section 13(d) of the Exchange Act, other than Parent or any Parent Subsidiaries.

36. Additionally, the Company must promptly advise New Media of any proposals or inquiries received from other parties. Section 7.04(e) of the Merger Agreement states:

The Company shall notify Parent promptly (but in any event within 48 hours) after receipt or occurrence of any Company Acquisition Proposal, or any request for information that is reasonably likely to lead to a Company Acquisition Proposal, of (i) the material terms and conditions of any such Company Acquisition Proposal and (ii) the identity of the Person making any such Company Acquisition Proposal. In addition, the Company shall promptly (but in any event within 48 hours) after the receipt thereof, provide to Parent copies of any Company Acquisition Proposal and any written documentation or correspondence setting forth or reflecting the terms (or revised terms) of such Company Acquisition Proposal (including any financing thereof) which is sent or received in respect of such Company Acquisition Proposal between the Company and the Person making such Company Acquisition

8

> Proposal (or by any of their respective Representatives on its behalf). The Company shall keep Parent informed on a reasonably current basis of the status and material details and substantive discussions (including any amendments or proposed amendments) of any such Company Acquisition Proposal. The Company shall provide to Parent any non-public information concerning the Company prior to or concurrently with providing such information to any other Person in connection with any Company Acquisition Proposal, to the extent such information was not previously provided to Parent. The Board of Directors of the Company shall promptly consider in good faith (in consultation with its outside legal counsel and financial advisors) any proposed alteration of the terms of this Agreement or the Merger proposed by Parent in response to any Company Acquisition Proposal. The Company agrees that it and the Company Subsidiaries will not enter into any agreement with any Person subsequent to the date of this Agreement that prohibits by its terms the Company from providing any information to Parent under, or otherwise complying with the terms of, this Section 7.04.

37. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to change its recommendation of the Proposed Transaction under extremely limited circumstances, and grants New Media a "matching right" with respect to any "Superior Proposal" made to the Company. Sections 7.04(c) and (d) of the Merger Agreement provide:

> (c) Except as expressly permitted by this Section 7.04(c), neither the Board of Directors of the Company nor any committee thereof shall (i) change, withdraw, modify, qualify, withhold or amend in any manner adverse to Parent the Company Recommendation (or publicly propose to do so), (ii) approve, declare advisable or recommend (or publicly propose to do so) any Company Acquisition Proposal, (iii) fail to include the Company Recommendation in the Joint Proxy Statement/Prospectus, (iv) make or publicly propose to make any recommendation in connection with a tender offer or exchange offer other than a recommendation against such offer or a customary "stop, look and listen" communication by the Board of Directors of the Company (it being understood that the Board of Directors of the Company may refrain from taking a position with respect to such a tender offer or exchange offer until the close of business as of the tenth (10th) Business Day after the commencement of such tender offer or exchange offer without such action being considered a Company Change in Recommendation and that no customary "stop, look and listen" communication will be considered a Company Change in Recommendation), (v) after receipt of any Company Acquisition Proposal, other than with respect to the period of up to ten (10) Business Days applicable to tender or exchange offers that are the subject of the preceding clause (iv), fail to publicly reaffirm the Company Recommendation or fail to recommend against a Company Acquisition Proposal  within five (5) Business Days after a

9

request by Parent to do so (provided that Parent may make no more than two (2) such requests for each Company Acquisition Proposal) (provided, further, that Parent may make an additional one (1) request for each modification to the price or other material terms of any Company Acquisition Proposal) (it being agreed that neither the delivery of a notice by the Company described in Section 7.04(d) nor any public announcement thereof shall constitute a Company Change in Recommendation) (any of (i) through (v) a "Company Change in Recommendation") or (vi) authorize, cause or permit the Company or any of the Company Subsidiaries to enter into any letter of intent, agreement, commitment or agreement in principle providing for any Company Acquisition Proposal (other than a confidentiality agreement entered into in accordance with Section 7.04(a)). Notwithstanding the foregoing, the Board of Directors of the Company (A) may make a Company Change in Recommendation at any time prior to the receipt of the Required Company Vote (x) in response to a Company Intervening Event, or (y) following receipt after the date of this Agreement of an unsolicited bona fide written Company Acquisition Proposal that did not result from or arise out of a breach of this Section 7.04 and that the Board of Directors of the Company determines in good faith, in consultation with its financial advisors and outside legal counsel, is a Company Superior Proposal, in the case of each of (x) and (y), if and only if the Board of Directors of the Company has first determined in good faith, after consultation with its financial advisors and outside legal counsel, that the failure to take such action would be inconsistent with the fiduciary duties of the Board of Directors of the Company to the Company's stockholders under applicable Law and the Company first complies with Section 7.04(d) or (B) at any time prior to the receipt of the Required Company Vote and following receipt of an unsolicited bona fide written Company Acquisition Proposal that did not result from or arise out of a breach of this Section 7.04 and which the Board of Directors of the Company determines in good faith, in consultation with its financial advisors and outside legal counsel, is a Company Superior Proposal, may authorize and cause the Company to terminate this Agreement for the purpose of entering into a definitive acquisition agreement, merger agreement or similar definitive agreement (a "Company Alternative Acquisition Agreement") with respect to such Company Superior Proposal, if and only if the Board of Directors of the Company has first determined in good faith, after consultation with its financial advisors and outside legal counsel, that the failure to take such action would be inconsistent with the fiduciary duties of the Board of Directors of the Company to the Company's stockholders under applicable Law and the Company first complies with Section 7.04(d) and concurrently with entering into a Company Alternative Acquisition Agreement with respect to such Company Superior Proposal, (1) the Company terminates this Agreement in accordance with the provisions of Section 9.01(g) and (2) the Company pays the Company Termination Fee in accordance with Section 9.02(f). Notwithstanding anything to the contrary in this Section 7.04, neither (1) the determination in itself by the Board of Directors of the Company that a Company Acquisition Proposal constitutes or is reasonably be expected to result in a Company Superior Proposal nor (2) the delivery in itself by the Company to Parent of any notice contemplated by Section 7.04(d) or Section 7.04(e) will

constitute a Company Change in Recommendation or violate this Section 7.04(c).

(d) Prior to the Board of Directors of the Company making a Company Change in Recommendation pursuant to Section 7.04(c)(A)(x), the Company shall provide Parent with five (5) Business Days' prior written notice advising Parent it intends to effect a Company Change in Recommendation and specifying, in reasonable detail, the reasons therefor and, during such five (5) Business Day period, if requested by Parent, the Company shall engage in good faith negotiations with Parent to amend the terms of this Agreement in a manner that would make the failure to effect a Company Change in Recommendation no longer inconsistent with the fiduciary duties of the Board of Directors of the Company to the Company's stockholders under applicable Law and, following the end of such notice period, the Board of Directors of the Company shall have considered in good faith any revisions to the terms of this Agreement proposed by Parent, and shall have determined in good faith, after consultation with its financial advisors and outside legal counsel, that the failure to take such action would be inconsistent with the fiduciary duties of the Board of Directors of the Company to the Company's stockholders under applicable Law. Prior to the Board of Directors of the Company making a Company Change in Recommendation pursuant to Section 7.04(c)(A)(y) or authorizing and causing the termination of this Agreement as described in Section 7.04(c)(B), the Company shall provide Parent with five (5) Business Days' prior written notice (it being understood and agreed that any amendment to the amount or form of consideration payable in connection with the applicable Company Acquisition Proposal and any material amendment to any other material term of the applicable Company Acquisition Proposal shall require a new notice and an additional three (3) Business Day period) advising Parent that the Board of Directors of the Company intends to take such action, and specifying the material terms and conditions of, and including a copy of any transaction documents relating to, the Company Superior Proposal, and during such five (5) Business Day period (or any subsequent three (3) Business Day period), if requested by Parent, the Company shall negotiate in good faith with Parent to make such adjustments to the terms and conditions of this Agreement such that such Company Acquisition Proposal would no longer constitute a Company Superior Proposal and, following the end of such notice period, the Board of Directors of the Company shall have considered in good faith any revisions to the terms of this Agreement proposed by Parent, and shall have determined in good faith, after consultation with its financial advisors and outside legal counsel, that the failure to take such action would be inconsistent with the fiduciary duties of the Board of Directors of the Company to the Company's stockholders under applicable Law and that the Company Acquisition Proposal would continue to constitute a Company Superior Proposal if the revisions proposed by Parent were given effect.

38.    The Merger Agreement also provides for a "termination fee" of $45 million payable by the Company to Parent if the Individual Defendants cause the Company to terminate the Merger

Agreement.

*The Registration Statement Omits Material Information*

39. Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.

40. As set forth below, the Registration Statement omits material information with respect to the Proposed Transaction.

41. First, the Registration Statement omits material information regarding the Company's, New Media's, and the combined company's financial projections.

42. With respect to the Company's financial projections, the Registration Statement fails to disclose, for each set of projections: (i) all line items used to calculate Adjusted EBITDA; (ii) all line items used to calculate unlevered free cash flow; (iii) a reconciliation of all non-GAAP to GAAP metrics; and (iv) the "Huber Street Case" and all underlying line items.

43. With respect to New Media's financial projections, the Registration Statement fails to disclose, for each set of projections: (i) all line items used to calculate Adjusted EBITDA; (ii) all line items used to calculate unlevered free cash flow; (iii) a reconciliation of all non-GAAP to GAAP metrics; and (iv) the "Citi Street Case" and all underlying line items.

44. With respect to the combined company forecasts, the Registration Statement fails to disclose, for each set of projections: (i) all line items used to calculate Adjusted EBITDA; (ii) all line items used to calculate unlevered free cash flow; and (iii) a reconciliation of all non-GAAP to GAAP metrics.

45. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial

advisor in support of its fairness opinion.

46. Second, the Registration Statement omits material information regarding the analyses performed by the Company's financial advisors in connection with the Proposed Transaction, Greenhill & Co., LLC ("Greenhill") and Goldman Sachs & Co. LLC ("Goldman").

47. With respect to Greenhill's Illustrative Discounted Cash Flow Analysis of Gannett, the Registration Statement fails to disclose: (i) all line items used to calculate unlevered free cash flow; (ii) the "Huber Street Case" projections and all underlying line items; (iii) Greenhill's basis for applying multiples of 4.5x to 6.5x; (iv) the ranges of terminal values for Gannett; and (v) the individual inputs and assumptions underlying the discount rate range of 8.0% to 9.0%.

48. With respect to Greenhill's Discounted Cash Flow Analysis of New Media, the Registration Statement fails to disclose: (i) all line items used to calculate unlevered free cash flow; (ii) the "Citi Street Case" projections and all underlying line items; (iii) the ranges of terminal values for New Media; (iv) Greenhill's basis for applying multiples of 5.0x to 7.0x; and (v) the individual inputs and assumptions underlying the discount rate range of 9.0% to 10.0%.

49. With respect to Greenhill's Illustrative Discounted Cash Flow with Synergies Sensitivity Analysis for Gannett Shares on a Pro Forma Basis, the Registration Statement fails to disclose: (i) all line items used to calculate unlevered free cash flow; (ii) the range of terminal values for New Media on a pro forma basis; (iii) Greenhill's basis for applying a multiple of 5.5x; and (iv) the individual inputs and assumptions underlying the discount rate of 9.5%.

50. With respect to Greenhill's Illustrative Value Creation Analysis, the Registration Statement fails to disclose Greenhill's basis for applying multiples ranging from 4.5x to 6.5x.

51. With respect to Goldman's Illustrative Discounted Cash Flow Analysis of Gannett, the Registration Statement fails to disclose: (i) all line items used to calculate unlevered free cash

flow; (ii) the individual inputs and assumptions underlying the discount rates ranging from 7.0% to 8.0% and the perpetuity growth rates ranging from negative 5% to negative 1%; (iii) the range of terminal values for Gannett; and (iv) Goldman's basis for applying multiples ranging from 4.5x to 6.5x.

52. With respect to Goldman's Illustrative Present Value of Future Stock Price Analysis of Gannett, the Registration Statement fails to disclose: (i) Goldman's basis for applying multiples of 4.5x to 6.5x; and (ii) the individual inputs and assumptions underlying the discount rate of 7.5%.

53. With respect to Goldman's Premia Analysis, the Registration Statement fails to disclose: (i) the transactions observed by Goldman in the analysis; and (ii) the premiums paid in the transactions.

54. With respect to Goldman's Illustrative Discounted Cash Flow Analysis of New Media, the Registration Statement fails to disclose: (i) all line items used to calculate unlevered free cash flow; (ii) the individual inputs and assumptions underlying the discount rates ranging from 7.0% to 8.0% and the perpetuity growth rates ranging from negative 7% to negative 2%; (iii) the range of terminal values for New Media; and (iv) Goldman's basis for applying multiples ranging from 4.5x to 6.5x.

55. With respect to Goldman's Illustrative Present Value of Future Stock Price Analysis of New Media, the Registration Statement fails to disclose: (i) Goldman's basis for applying multiples of 4.5x to 6.5x; and (ii) the individual inputs and assumptions underlying the discount rate of 7.5%.

56. With respect to Goldman's Illustrative Discounted Cash Flow Analysis of New Media on a pro forma basis, the Registration Statement fails to disclose: (i) all line items used to

calculate unlevered free cash flow; (ii) the individual inputs and assumptions underlying the discount rates ranging from 7.0% to 8.0%; (iii) the range of terminal values for New Media on a pro forma basis; and (iv) Goldman's basis for applying multiples ranging from 4.5x to 6.5x.

57. With respect to Goldman's Illustrative Present Value of Future Stock Price Analysis of New Media on a pro forma basis, the Registration Statement fails to disclose: (i) Goldman's basis for applying multiples of 4.5x to 6.5x; and (ii) the individual inputs and assumptions underlying the discount rate of 7.5%.

58. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

59. Third, the Registration Statement omits material information regarding potential conflicts of interest of Greenhill and Goldman.

60. The Registration Statement fails to disclose the timing and nature of the past services Greenhill provided to the Company, Fortress, and their affiliates.

61. The Registration Statement fails to disclose whether Greenhill has performed past services for New Media or its affiliates, as well as the timing and nature of such services and the amount of compensation received by Greenhill for such services.

62. The Registration Statement fails to disclose the amount of compensation Goldman received for the past services it provided to Softbank and its affiliates.

63. The Registration Statement also fails to disclose whether Goldman has performed past services for New Media or its affiliates, as well as the timing and nature of such services and the amount of compensation received by Goldman for such services.

64. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

65. The omission of the above-referenced material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) Background of the Merger; (ii) Gannett's Reasons for the Merger; Recommendation of the Gannett Board; (iii) Certain New Media and Gannett Unaudited Prospective Financial Information; and (iv) Opinions of Gannett's Financial Advisors.

66. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Gannett**

67. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

68. The Individual Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Gannett is liable as the issuer of these statements.

69. The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

70. The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

71. The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

72. The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

73. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

74. Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and New Media

75. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

76. The Individual Defendants and New Media acted as controlling persons of Gannett within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or Board members of Gannett and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

77. Each of the Individual Defendants and New Media was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

78. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Registration Statement.

79. New Media also had supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

80. By virtue of the foregoing, the Individual Defendants and New Media violated Section 20(a) of the 1934 Act.

81. As set forth above, the Individual Defendants and New Media had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: September 16, 2019

**RIGRODSKY & LONG, P.A.**

By: */s/ Gina M. Serra*
Brian D. Long (#4347)
Gina M. Serra (#5387)
300 Delaware Avenue, Suite 1220
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: bdl@rl-legal.com
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RM LAW, P.C.**
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305